United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL BELL,

                Plaintiff,

    vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                Defendant.

Case No.   12-cv-05738-MEJ

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 18

## INTRODUCTION

Plaintiff Michael Bell ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),
seeking judicial review of the decision of the Commissioner of Social Security, Defendant
Carolyn W. Colvin[1], denying Plaintiff's claim for disability benefits.  Pending before the Court are
the parties' cross-motions for summary judgment.  (Dkt. Nos. 14, 18.)  Pursuant to Civil Local
Rule 16-5, the motions have been submitted on the papers without oral argument.  Having
carefully reviewed the parties' papers, the administrative record ("AR") in this case, and relevant
legal authority, the Court hereby DENIES Plaintiff's Motion and GRANTS Defendant's Cross-
Motion for Summary Judgment for the reasons set forth below.

## BACKGROUND

Plaintiff was born on March 1, 1959, and was 52 years old at the time of his hearing before
the Administrative Law Judge.  (AR 41, 150.)  Plaintiff worked for Sunset Scavenger from June

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted
for Michael J. Astrue as the defendant in this suit.  No further action needs to be taken to continue
this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §
405(g).

United States District Court
Northern District of California

1978 through February 2010.  (AR 199.)  He originally worked as a residential garbage man, but injured his left knee and right ankle while exiting a garbage truck at work on November 12, 2003.  (AR 44, 354).  Plaintiff was subsequently transferred to the position of Debris Box Driver, picking up and dropping off debris boxes.  (AR 44-45, 199.)  He continued to work for another six years, until having left knee replacement surgery on February 11, 2010.  (AR 395-401, 630-32.)  He has not worked since.

**A.      Michael Jaffin, M.D.**

Plaintiff sought medical treatment from Dr. Jaffin in 2008 and continued to seek treatment from him until he filed his disability claim.  (AR 361-444, 715-21.)  While seeking treatment from Dr. Jaffin, Plaintiff continued to work for six years, despite having knee, hip and back pain.  (AR 155, 395-96, 398-401, 403-08, 410-11, 715-21.)  During this time, Plaintiff's treatment consisted of pain medication and physical therapy.  (AR 327-31, 333-36, 338-43, 350, 354-56, 358-60, 383, 391-92, 396, 398-401, 403-08, 410-11, 444.)

In June 2008, Dr. Jaffin performed a physical examination in which he found that Plaintiff walked with "reasonable gait," but his lower extremities showed remarkable weakness of toe flexion and plantar flexion of his ankle.  (AR 410.)  Dr. Jaffin also found that Plaintiff had poor push-off on the right and could not toe walk on the right.  (AR 410.)  Standing x-rays revealed significant degenerative changes of the left knee.  (AR 410.)  Dr. Jaffin diagnosed Plaintiff with severe degenerative joint disease of the left knee and left calf atrophy, but opined that Plaintiff could "continue working in his current capacity," and prescribed him 50 mg of Indomethacin (prescription strength Motrin).  (AR 410-11.)

Over the course of several monthly evaluations from July 2008 through December 2009, Dr. Jaffin opined that Plaintiff could continue to work.  (AR 395-401, 403-07.)  It appears that Dr. Jaffin contemplated knee replacement surgery earlier on, but had "held off a longtime because of [Plaintiff's] relative youth."  (AR 395.)  However, by December 2009, Dr. Jaffin opined that because Plaintiff had reached the end-stage of his degenerative joint disease of the left knee, there was no other reasonable alternative other than knee surgery.  (AR 395.)

On February 11, 2010, Plaintiff underwent left knee replacement surgery without any

1    complications. (AR 369-72, 622-23.)  Prior to the operation, Dr. Jaffin noted that Plaintiff was

2    able to walk reasonably well with just a minor limp and could squat and recover.  (AR 373).  An

3    x-ray taken on February 12, 2010 showed that the total knee arthroplasty was in "good position

4    without fracture, dislocation, or loosening."  (AR 291-92).  On February 25, 2010, Dr. Jaffin noted

5    that Plaintiff was "doing well," had up to 90 degrees of flexion, and could walk well without an

6    aid.  (AR 368).

7        Continuing into April and May of 2010, Dr. Jaffin noted that the Plaintiff was doing

8    "extremely well" with over 110 degrees of flexion and no new injuries.  (AR 362-63.)  In

9    September 2010, Plaintiff still walked well and had "excellent range of motion."  (AR 581.)

10   Despite there being a "little bit" of degenerative changes, Dr. Jaffin opined that the February 2010

11   hip x-rays did not show any obvious fractures or significant boney abnormalities.  (AR 581.)

12       On November 9, 2010, Dr. Jaffin completed a Long Term Disability Claim Physician

13   Statement in regards to Plaintiff's worker's compensation claim.  (AR 575-77.)  Dr. Jaffin noted

14   Plaintiff was still recovering from his knee surgery and was suffering from pain and decreased

15   range of motion.  (AR 575.)  He opined that Plaintiff was limited to walking, standing, bending,

16   and lifting, but was unable to determine how long Plaintiff could perform these activities because

17   he "lack[ed] the means to measure [it]."  (AR 576.)

18       The following day, on November 10, 2010, Plaintiff took a series of x-rays which revealed

19   a slight narrowing and sclerosis of the hip joints and bone spurs. (AR 546-48.)  The reviewing

20   doctor, however, dismissed it as ""nothing acute"" because he found "the bony structures [were]

21   otherwise unremarkable." (AR 546.)  A right knee x-ray in December 2010 showed mild to

22   moderate osteoarthritis and some calcification of the knee cartilage, but was dismissed as well

23   because there was no joint effusion and the soft tissues were unremarkable. (AR 554.)

24       Plaintiff continued to seek treatment from Dr. Jaffin until December 2011.  (AR 572-74,

25   614-15, 715-21.)  From December 2010 until December 2011, Dr. Jaffin consistently opined that

26   Plaintiff was doing "extremely well" with his knee replacement and that Plaintiff had great range

27   of motion.  (AR 572-74, 614-15, 715-21.)

28       However, in a Physical Capacities Evaluation, which is undated and unsigned, Dr. Jaffin

United States District Court
Northern District of California

3

opined that Plaintiff would not be able to sit and stand for more than 45 minutes and walk for more than 20 minutes during an eight-hour work day.  (AR 729.)  In this unsigned evaluation, Dr. Jaffin also noted that he was unable to define whether or not Plaintiff would be able to lift or carry a certain amount of weight because he needed a final function capacity evaluation.  (AR 730.)

**B.      Dr. Calvin Pon, M.D.**

Dr. Pon, a state agency physician, conducted a comprehensive Health Analysis for Plaintiff on August 16, 2010.  (AR 476-79.)  At the time of the analysis, Plaintiff complained of having lower back, hip, knee, and ankle pains.  (AR 476.)  Although Plaintiff said he could stand and walk without a cane, he did not know his tolerance level.  (AR 476.)  In general, Plaintiff only used a cane if he needed to ambulate for long distances, and was capable of walking up and down the stairs and around his house without a cane.  (AR 476.)  Moreover, in addition to driving his own car, preparing his own meals, and maintaining his own hygiene, Plaintiff was also able to help out with chores like shopping for groceries, taking out the garbage, and cleaning the laundry. (AR 477.)

According to Dr. Pon''s observations, Plaintiff was able to move with relative ease. Not only was Plaintiff capable of sitting comfortably in the waiting room, he was able to get out of his chair and walk into the exam room without any visible problems.  (AR 477.)  He walked with a steady gait without limping or using his cane.  (AR 477.)  During the exam, Plaintiff demonstrated he was able to get on and off the exam table normally and could squat approximately one third of the way down--limited only by the pain in his right knee.  (AR 477.)

Even though Plaintiff's gait velocity and stride length were slightly less than normal, Dr. Pon noted that Plaintiff was otherwise fine.  (AR 477.)  He demonstrated normal flexion at 70 degrees with only a slight limitation in lateral bending at the lumbar spine and trunk, and despite some limitations due to pain, Plaintiff was able to fully extend and flex his left knee approximately 120 degrees.  (AR 477-78.)  Moreover, Plaintiff did not suffer from any speech or gross visual impairments, and was able to hear and understand normal conversational speech.  (AR 478.)

Based on the examination, Dr. Pon assessed that Plaintiff could: stand and walk short distances without a cane for a total of about four hours during an eight-hour work day; sit for a

total of about six hours in an eight-hour workday; occasionally perform limited crouching, kneeling, squatting, crawling, and stair climbing; and climb ladders on rare occasions. (AR 478.) Dr. Pon also opined that Plaintiff did not have any restrictions in exercising arm and hand control or in performing any bilateral actions like pushing, pulling, and reaching. (AR 479.) According to Dr. Pon's assessment, Plaintiff should be able to frequently lift and carry 10-plus pounds and even occasionally lift and carry 20-plus pounds without any problems. (AR 479.) Dr. Pon found that Plaintiff's bilateral knee and right ankle pain should not hinder his ability to perform bilateral pushing or interfere with his exercise of control over his leg and foot. (AR 479.)

**C.      Stephen E. Conrad, M.D.**

On August 24, 2010, orthopedist Stephen Conrad examined Plaintiff as part of an Agreed Medical Evaluation. (AR 491-510.) During the evaluation, Dr. Conrad noted that Plaintiff was able to walk with a normal gait without any signs of limping and could exhibit a normal heel and toe walk. (AR 497.) The alignment of the Plaintiff''s lower extremities was also normal without evidence of any atrophy. (AR 497.) However, Plaintiff tested negative in the straight-leg raising test for both seated and reclining positions, and Dr. Conrad found Plaintiff''s right knee, left knee, lumbosacral junction, and right ankle to be tender to direct palpitations. (AR 497-8.) Based on Plaintiff's circumferential measurements, there was also an indication that there was a mild degree of atrophy in Plaintiff''s right calf and left thigh. (AR 499.) Due to these findings, Plaintiff was advised against returning to his former job at Sunset Scavenger. (AR 509.) Dr. Conrad also recommended further work restrictions that precluded Plaintiff from crouching, crawling, pivoting, kneeling, squatting, walking on uneven terrain, climbing, and engaging in activities of comparable physical effort. (AR 504.)

**D.      S. Jaituni, M.D.**

On November 18, 2010, State Agency Physician Dr. Jaituni reviewed Plaintiff's record and conducted a Physical Residual Functional Capacity Assessment. (AR 549-53.) He determined that Plaintiff did not have any visual, manipulative, communicative, or environmental limitations, and was only limited by some exertional limitations. (AR 550-52.) In his opinion, while Plaintiff's ability to push or pull with his lower extremities were limited, he would still be able to:

United States District Court
Northern District of California

1    occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for at least

2    six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. (AR

3    550.)

4    **E.**      **Richard Brophy, D.C.**

5         Plaintiff began treatment with Dr. Brophy, a chiropractor, in December 2010.  (AR 706.)

6    He complained of lower back pain, muscle spasms, and difficulty standing, climbing, walking, and

7    bending, and was diagnosed with lumbar spine pain.  (AR 711-13.)

8         On January 6, 2012, Dr. Brophy completed a Physical Capacities Evaluation.  (AR 725-

9    28.)  In the evaluation, Dr. Brophy determined that Plaintiff was in severe pain, and that the pain

10    was interfering with his sleep, daily living activities, and relationship with others.  (AR 728.)

11    However, he opined that Plaintiff would still be able to: sit, stand, and walk 1-2 hours at a time in

12    an eight-hour workday, followed by 30 minutes of rest; continuously lift and carry 20 pounds;

13    occasionally lift and carry 50 pounds; repetitively grasp, push, pull, and manipulate; occasionally

14    bend, squat, and climb; and continuously reach above shoulder level.  (AR 725-26.) He noted that

15    Plaintiff's pain will increase in severity with prolonged lifting, bending, walking and stooping.

16    (AR 728.) In regards to restrictions, Dr. Brophy determined that there were only some mild

17    restrictions on activities involving unprotected heights, moving machinery, and exposure to

18    marked changes in temperature and humidity. (AR 727.)  There were no restrictions at all on

19    driving automotive equipment or exposure to dust, fumes, and gases.  (AR 727.)

20    **F.**      **Kyle Gaasbeck, M.D.**

21         On February 27, 2011, Dr. Gaasbeck examined Plaintiff as part of a Comprehensive

22    Psychiatric Evaluation. (AR 586-90.)  During the evaluation, Plaintiff claimed that he had become

23    withdrawn and short-tempered because he felt stressed over his financial situation and the need to

24    deal with the disability system.  (AR 586.)  Dr. Gaasbeck diagnosed Plaintiff with adjustment

25    disorder with anxiety, but opined that the "problem [was] treatable."  (AR 589.)  He recommended

26    that Plaintiff speak to someone about his stress, and claimed that Plaintiff''s stress level would

27    improve, if not disappear altogether, with better financial stability.  (AR 589.)  Based on the

28    evaluation, Dr. Gaasbeck determined that Plaintiff could: handle his own funds, perform simple

United States District Court
Northern District of California

6

and repetitive tasks; perform detailed and complex tasks, interact with his coworkers and the public; complete a normal workday without interruption from a psychiatric condition, and deal with the usual stress encountered in a workplace.  (AR 589.)

**G.     Additional Documentation**

In March 2010, Plaintiff filed a Disability Report (AR 190-98), claiming inability to work due to a recent knee replacement surgery and pain in his hip and right ankle.  (AR 191.)  On June 18, 2010, he completed an Exertion Questionnaire (AR 211-13) in which he explained his wife did most of the household chores, but he helped as much as he could by carrying the groceries, driving the children to school, and taking out the garbage. (AR 211-12.)

After the first application was rejected, Plaintiff completed a Disability Report Appeal in January 2011. (AR 222-28). In the appeal, he complained of pain in his left knee, hip, and ankle, chronic pain in his lower back, and financial stress and depression stemming from the pain.  (AR 222.)  Despite seeing a chiropractor, Plaintiff claimed the chronic pains were making it difficult for him to sleep, stand or sit for long periods, or do household chores. (AR 223, 226.)

On February 16, 2011, Plaintiff completed a Self-Function Report, where he listed his daily activities as including bathing, driving his children to school, watching television, going on short walks, shopping for groceries, playing on the computer, reading, and helping his children with their homework.  (AR 239-40, 243.)  In the report, Plaintiff mentioned that he did not handle stress well, and could not sit or stand for long periods or perform any heavy lifting, squatting, bending, or kneeling. (AR 244-45.) At the same time, however, it was noted that Plaintiff did not have any issues with personal care and grooming.  (AR 240.)  He could iron, do laundry, shop for groceries, and manage the family's finances.  (AR 240-42.)

On the same day Plaintiff completed the Self-Function Report, Plaintiff's wife, Lesia Bell, completed a Third Party Function Report, which matched the Plaintiff's report.  (AR 231-38.)  She noted in her report that the stress stemming from Plaintiff's disability was adversely affecting his personality, causing him to become short-tempered, snappy, and irritable, which has lead him to isolate himself from his friends and family.  (AR 238.)

United States District Court
Northern District of California

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On March 25, 2010, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability from February 11, 2010.  (AR 20, 65.)  On October 8, 2010, the Social Security Administration ("SSA") denied Plaintiff's claim, finding that he did not qualify for disability benefits.  (AR 67-71.)   Plaintiff subsequently filed for reconsideration on January 14, 2011, which was denied again on May 19, 2011.  (AR 72-77.)  On June 21, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 80-81.)  ALJ Caroline Beer conducted a hearing on February 14, 2012.  (AR 36-64.)  Plaintiff appeared at the hearing with his attorney, Ms. O'Sullivan. (AR 38.)  The ALJ heard testimony from both Plaintiff and Vocational Expert Lynda Berkley.  (AR 38.)

### A.       Plaintiff's Testimony

At the February 14 hearing, Plaintiff testified that he tried to keep working despite the injuries, but things had reached a point where he could no longer do so. According to Plaintiff, he was not the type of person who would stay off work if he could help it. There were only two instances where he had taken time off of work because of injuries. The first was when he was off work for two-and-a-half months after an orthoscopic surgery in 1981. (AR 53.)  The second was when he took a month off work after hurting his back in 1997. (AR 53.)  Even when he twisted his knee at work in 2004, he "just wrap[ped it] up and ke[pt] working."  (AR 45.)  He worked until he was told he could not work as a garbage man anymore, at which time he transferred to the Debris Box Driver position, where he worked for several years before leaving just prior to his knee surgery. (AR 45-46.)  He has not done any paid work since. (AR 46.)  Despite leaving the workforce, however, Plaintiff testified that he has continued to help out in the community by volunteering as a chaplain at a local hospital one weekend a month and making hospice visits about once a month.  (AR 46.)

In regards to his injury, Plaintiff testified that he was still suffering from pain and discomfort. Even though his left knee was fine, he lacked the full flexibility that he had before surgery. (AR 55.) And his right knee and hip hurt because he had been compensating with his right hip for years prior to the surgery.  (AR 47, 55.)  As a result, he has been receiving continued

chiropractic treatment and exams for his lower back and right knee to make sure that everything is fine. (AR 47.) In terms of medication, Plaintiff testified that he took Oxycotin for pain at least twice a day. (AR 48.) On a scale of 1 to 10, he estimated that his pain level would go down to a 3 or 4 after taking the medication, but never completely all the way down. (AR 49.)

Lastly, Plaintiff testified that he has been experiencing problems in his daily living because of the pain and injury. He explained that he could only sit for 20-30 minutes before having to shift his position, and could not stand for more than 20 minutes without getting a numb, aching pain in his side. (AR 54.) Even alternating between sitting and standing during an 8-hour workday was impossible without medication, which also had the unwanted effect of making him drowsy. (AR 54.) In terms of sleep, Plaintiff claimed that he could sleep about three hours if he took his medication, but would still have to shift, get up, or turn on his side throughout the night. (AR 55.) This made him tired during the day, so he would take 30-45 minute naps. (AR 55.)

Despite the pain and injury, Plaintiff remained active. He drove "pretty much every day," taking his children to track practice, attending church, and running errands for his wife. (AR 42-43, 52.) On a typical day, he would take his children to school, pick them up, read, run errands, grocery shop with his wife, take care of personal needs like showering and shaving, and watch television. (AR 49-50.) He also tried to walk around the park near his house up to three times a week, and would sometimes play golf, tennis, and bowling on the Wii gaming console. (AR 51.)

**B.      Vocational Expert's Testimony**

Ms. Berkley appeared by phone as a vocational expert. (AR 39.) She testified that the exertional level of Plaintiff's previous work as a garbage collector was classified as "very heavy,"" and that his work as a debris box driver was classified as "medium." (AR 59.)

The ALJ then proposed two hypotheticals to the expert. In the first, the ALJ asked Ms. Berkley to assume an individual of Plaintiff's age, education, and work history who is able to: lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours and stand or walk four to six hours during an eight-hour day; frequently push and pull with the bilateral lower extremities; use a cane for uneven surfaces and prolonged ambulation; frequently balance; and occasionally stoop, climb stairs and ramps, kneel, and crouch. (AR 60.) The ALJ asked if this

9

individual would be able to crawl or climb ladders.  (AR 60.)

In response, the vocation expert testified that there were several jobs that the first hypothetical person could perform, including: small products assembler, DOT 706.684-022, an unskilled job with a light exertional level and approximately 100,000 jobs in the national economy and 1,000 locally; office helper, DOT 239.567-010, an unskilled job with a light exertional level and about 95,000 jobs in the national economy and 2,500 locally; and production assembler, DOT 706.687-010, an unskilled job with a light exertional level and about 300,000 jobs in the national economy and 1,800 locally.  (AR 61-62.)

In the second hypothetical, the ALJ asked the vocational expert to assume everything in the first hypothetical, except that the individual cannot use the hand with the cane. (AR 62.)  The vocational expert testified that this would "preclude [all] work because it [would make] the person a one-armed worker while [] standing."  (AR 62.)

In a follow-up question, Plaintiff's attorney asked if a hypothetical person would be precluded from all work if he was limited to sitting for 45 minutes, standing for 45 minutes, and walking for 20 minutes in an eight-hour day. (AR 62.)  The vocational expert testified that it would preclude all eight-hour day work.  Plaintiff's attorney then asked a second hypothetical--an individual able to sit for 1-2 hours and walk for 1-2 hours in an eight-hour day, with each sitting, standing, and walking followed by 30 minutes of rest.  (AR 63.)  The vocational expert testified that these limitations would also preclude all eight-hour day work.  (AR 63.)  Plaintiff's attorney then asked a third hypothetical--an individual able to sit for 30-40 minutes, stand for 20 minutes, and walk for about 20 minutes in an eight-hour day.  (AR 63.)  The vocational expert testified that such an individual would not be able to perform work in the national economy because it implies he would only be able to work one hour a day.  (AR 63.)

**C.      The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide a five-step sequential analysis for determining whether a Social Security claimant is disabled.[2]  20 C.F.R. §

_____

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a

United States District Court
Northern District of California

404.1520 (a). The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof in demonstrating disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id*. (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i) and 404.1520(b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since February 11, 2010. (AR 22.)

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: status post total left knee replacement; degenerative osteoarthritis of the bilateral knees; multilevel intervertebral disc disease; lumbar spine with spinal stenosis, L4-L5; sprained right ankle; and posttraumatic strain, medial collateral ligament, left ankle. (AR 22.) The ALJ determined, however, that Plaintiff's depression was not a severe impairment, finding that it caused no more than mild limitations. (AR 23.)

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is

---

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have any impairment or combination of impairments meeting or equaling in severity any impairment set forth in the Listing of Impairments.  (AR 23.)

Before proceeding to step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms.  20 C.F.R. § 404.1545.  In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere.  20 C.F.R. § 404.1545(a)(1)-(2).  Here, the ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with certain variations.  (AR 23.) Specifically, the ALJ determined that Plaintiff can:

> lift and carry 10 pounds frequently and 20 pounds occasionally, sit for 6 hours in an 8-hour workday, stand and/or walk 4-6 hours in an 8-hour workday, and push/pull frequently with the bilateral lower extremities.  The claimant requires a cane for uneven surfaces and prolonged ambulation (the claimant is not precluded from using his bilateral arms while standing, on even surfaces, or when not walking a prolonged distance).  Finally, the claimant can frequently balance, never climb stairs, and occasionally stoop, climb stairs/ramps, kneel, crouch, and crawl.

(AR 23.)

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. § 404.1520(f).  Past relevant work is work performed ""within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Here, Plaintiff has past relevant work as a garbage collector and garbage collector driver, but the vocational expert testified that Plaintiff was unable to perform these work. (AR 28.)  Based on the expert's testimony, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (AR 28.)

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

are other jobs existing in significant numbers in the national economy which the claimant can

perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §

404.1520(g); 20 C.F.R. § 404.1560(c).  The Commissioner can meet this burden by relying on the

testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20

C.F.R. pt. 404, subpt. P, app 2.  *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

Here, based on the testimony of the vocational expert, Plaintiff's age, education, work experience,

and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national

economy that Plaintiff can perform.  (AR 28.)

**D.     ALJ's Decision and Plaintiff's Appeal**

On February 24, 2012, the ALJ issued an unfavorable decision, finding that Plaintiff was

not disabled.  (AR 20-30.)  This decision became final when the Appeals Council declined to

review it on September 7, 2012.  (AR 1-3.)  Having exhausted his administrative remedies,

Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On March 13,

2013, Plaintiff filed his motion for summary judgment.  (Dkt. No. 14.)  On May 10, 2013, the

Commissioner filed a cross-motion for summary judgment.  (Dkt. No. 18.)

**LEGAL STANDARD**

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by

substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*,

246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence" means more than a

scintilla, but less than a preponderance, of evidence that a reasonable person might accept as

adequate to support a conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The

court must consider the administrative record as a whole, weighing the evidence that both supports

and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).

However, where the evidence is susceptible to more than one rational interpretation, the court

must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Determinations of credibility, resolution of conflicts in medical testimony, and all other

ambiguities are to be resolved by the ALJ.  *Id*.  Additionally, the harmless error rule applies where

United States District Court
Northern District of California

13

1    substantial evidence otherwise supports the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127,

2    1131 (9th Cir. 1990).

3                                    **DISCUSSION**

4           In his motion, Plaintiff raises three arguments in support of his position that this case

5    should be remanded with instructions to award benefits or, in the alternative, remand with

6    instructions for further proceedings.  First, Plaintiff argues that his disability meets or equals

7    listing 1.02 of 20 C.F.R. § 404 app. 1.  Second, Plaintiff argues that the ALJ violated 20 CFR

8    §404.1527, evaluating expert opinion evidence, when she accorded "great weight" to the opinion

9    of non-examining DDS employee Dr. Jaituni and failed to give appropriate weight to Dr. Jaffin,

10   the treating physician.  Third, Plaintiff argues that the ALJ's adverse credibility finding was not

11   supported by substantial evidence.  The Court shall consider each argument in turn.

12   **A.     Physician Opinions**

13          Plaintiff argues that the ALJ failed to give proper weight to his treating physician, Dr.

14   Jaffin.  Plaintiff asserts that Dr. Jaffin's opinion should have been given controlling weight, and

15   that the ALJ failed to comply with 20 C.F.R. § 404.1527 in determining Dr. Jaffin's opinion was

16   inconsistent with his treatment records and Plaintiff's daily activities.  Plaintiff further argues that

17   the ALJ erred in giving Dr. Jaituni's opinion great weight because it was not supported by

18   substantial evidence.

19          In response, the Commissioner argues that the ALJ thoroughly considered the objective

20   medical evidence and provided specific and legitimate reasons for not fully crediting Dr. Jaffin's

21   opinion.  Specifically, the Commissioner argues that the ALJ correctly found that Dr. Jaffin's

22   opinion was inconsistent with his treatment notes, the medical record, and Plaintiff's admitted

23   daily activities.  The Commissioner further argues that Dr. Jaituni's opinion is consistent with the

24   overall record, and supports the ALJ's decision.

25          "Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians:

26   (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

27   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

28   (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, an

United States District Court
Northern District of California

14

United States District Court
Northern District of California

opinion of a treating physician should be favored over that of a non-treating physician.  *Id.* at 830–31.  However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  If a treating physician's opinion is uncontradicted, an ALJ must give "clear and convincing" reasons that are supported by substantial evidence to reject the opinion.  *Lester*, 81 F.3d at 830-31.  However, if the treating physician's opinion is contradicted, an ALJ needs to only give "specific and legitimate reasons [that are] supported by substantial evidence in the record" to reject the opinion.  *Id.*  Further, the opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist.  20 C.F.R. § 404.1527(c)(5); 20 C.F.R § 416.927(c)(5).  "The ALJ is responsible for determining credibility and resolving conflicts" or ambiguities in the medical evidence.  *Magallanes*, 881 F.2d at 750.

In determining what weight to give a medical opinion, the ALJ should give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); 20 C.F.R. § 404.1527(d)(2).  As explained in Social Security Ruling 96–2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§] 404.1527. . . .  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96–2p at 4 (Cum. Ed. 1996), available at 61 FR 34490-01 (July 2, 1996).  Accordingly, when an ALJ finds a treating physician's opinion is not entitled to controlling weight, the following factors should be used to determine what weight to give that opinion: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any factors that may have bearing.  20

C.F.R. § 404.1527(c)(2)-(6); *see also Orn*, 495 F.3d at 632.

    1.    <u>Dr. Jaffin</u>

Here, the ALJ found that Dr. Jaffin's opinion was "clearly not consistent with his own progress reports" and Plaintiff's daily activities.  (AR 27.)  There appears to be no dispute that Dr. Jaffin is Plaintiff's treating physician and orthopedist.  (AR 25, 315.)

The ALJ summarized Plaintiff's medical records as follows.  In 2008, Plaintiff began treatment with Dr. Jaffin.  (AR 25, 315.)  The ALJ noted that Plaintiff's treatment records reflect treatment to his left knee and right ankle arising from a 2004 work-related injury.  (AR 25.)  After this injury, Plaintiff had a course of Naproxen and physical therapy and continued to work despite his injuries.  (AR 25.)  A "[p]hysical examination from June 2008 showed that [Plaintiff] walked with a reasonable gait and had a poor push-off on the right."  (AR 25.)  In December 2008, a MRI demonstrated that Plaintiff had significant spinal stenosis at L4-L5 and at L5-S1.  (AR 25.)  However, because the lumbar spine was not covered by Workers' Compensation, Dr. Jaffin ceased further treatment.  (AR 25.)  On February 11, 2010, "the [Plaintiff] underwent left knee replacement with no complications identified."  (AR 25.)  The ALJ noted from Dr. Jaffin's records that two weeks after knee surgery, Plaintiff had up to 90 degrees of flexion and walked well without aids. (AR 25, 368.)  The ALJ additionally noted that in the following month, Plaintiff could jump up and down, squat and recover, and had more than 110 degrees of flexion.  (AR 25, 362.)  At two months post surgery, Dr. Jaffin stated Plaintiff "walked well, and had more than 100 degrees of flexion."  (AR 25, 363.)

In contrast to this medical evidence, the ALJ noted that Dr. Jaffin's opinion consists of an undated Physical Capacities Evaluation, in which he opined that the Plaintiff could only sit 45 minutes, stand 45 minutes, and walk 20 minutes in an 8-hour workday, and occasionally bend, squat, crawl, climb, and reach above shoulder level.  (AR 27, 729-31.)  After reviewing the medical evidence, the ALJ found Dr. Jaffin's records showed "significant improvement following [Plaintiff's] left knee replacement."  (AR 28.)

The ALJ assigned Dr. Jaffin's treatment and progress notes "great weight" because they "provide contemporaneous descriptions of the [Plaintiff's] condition and abilities and these

progress notes cover a longitudinal period of time." (AR 27.)  However, the ALJ accorded Dr.

Jaffin's opinion little weight, finding that: (1) Dr. Jaffin's opinion is "clearly not consistent with

his own progress reports," which indicated that Plaintiff walks well with great range of motion,

has no limp, and can jump up and down; and (2) Dr. Jaffin's opinion is "inconsistent with

[Plaintiff's] activities of daily living." (AR 27.)

       a.      *Consistency Between Dr. Jaffin's Opinion and Treatment Records*

The first reason the ALJ gave Dr. Jaffin's opinion little weight was that she found Dr.

Jaffin's opinion to be inconsistent with his own findings. (AR 27.)  Consistency is determined by

examining the "record as a whole" and does not require similarity in findings over time despite a

claimant's evolving medical status. 20 C.F.R. § 404.1527 ("Generally, the more consistent an

opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."); *Orn*,

495 F.3d at 634 ("The primary function of medical records is to promote communication and

recordkeeping for health care personnel—not to provide evidence for disability determinations.

We therefore do not require that a medical condition be mentioned in every report to conclude that

a physician's opinion is supported by the record.").  However, the incongruity between a

physician's statement and medical records provides a "specific and legitimate" reason for rejecting

a physician's opinion. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Lester*,

81 F.3d at 830-31).

Having reviewed the administrative record in this case, the Court finds that the ALJ

properly gave Dr. Jaffin's opinion little weight based on the inconsistency between his opinion

and his own findings.  In his treatment records, Dr. Jaffin indicated that Plaintiff was able to work

from September 2008 until his preoperative appointment on January 28, 2010.  (AR 373, 383,

395-401, 403-07.)  Following surgery, he noted that Plaintiff walked well with great range of

motion, had no limp, and could jump up and down.  (AR 25, 27, 475, 573-74, 614-15, 715-20.)

He also indicated that Plaintiff's left knee replacement did "extraordinarily well." (AR 717.)  In

contrast to these treatment notes, Dr. Jaffin opined that Plaintiff had work restrictions that would

limit him to working to just under two hours in an 8-hour work day.  (AR 729-31.)  Dr. Jaffin did

not provide an explanation for this opinion that contradicted his treatment records.

United States District Court
Northern District of California

An ALJ must evaluate a physician's explanations for her opinion, and the weight given to an opinion depends on the strength of such explanations. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Here, Dr. Jaffin's treatment records fail to support his finding that Plaintiff suffered from significant functional limitations. *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); *Tommasetti*, 533 F.3d at 1041 (incongruity between medical records and opinion provided specific and legitimate reason for rejecting treating physician's opinion); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports).

Despite this inconsistency, Plaintiff argues that Dr. Jaffin's treatment records as a whole support his opinion. In support of his argument, Plaintiff directs the Court's attention to a December 7, 2011 report by Dr. Jaffin, in which he notes "[Plaintiff] remains unable to work." (AR 715.) However, within that same report, Dr. Jaffin also notes that Plaintiff "has done very well," that "exam reveals a nicely healed incision," that Plaintiff "can toe and heel walk, jump up and down," and that Dr. Jaffin would "recheck him in 5 weeks." (AR 715.) Nowhere does the report indicate that Plaintiff is disabled and permanently unable to perform any type of work. Further, a statement of "unable to work" by a medical source does not mean the ALJ must determine that a qualifying disability exists, nor does it carry any "special significance." 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."); *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (internal citation omitted). The ultimate determination of disability

is reserved to the Commissioner.  *Boardman v. Astrue*, 286 F. App'x 397, 399 (9th Cir. 2008); *see also* 20 C.F.R. § 404.1527(d)(2).  Accordingly, this argument is without merit.

In one sentence of his Motion, without providing any factual or legal support, Plaintiff also argues that Dr. Jaffin's opinion is supported by the opinions of Dr. Conrad and Dr. Brophy, Plaintiff's chiropractor.[3]  Dr. Conrad opined that Plaintiff was precluded from crouching, crawling, pivoting, kneeling, squatting, walking on uneven terrain, climbing, and activities of comparable physical effort.  (AR 26, 504.)  He recommended that Plaintiff not return to his former job.  (AR 28, 509.)  The ALJ gave Dr. Conrad's opinion "some weight" based on his extensive record review and specialty in the field of orthopedics.  (AR 27.)  However, the ALJ found Dr. Conrad's "postural limitations [were] not consistent with the improvement demonstrated by Dr. Jaffin's reports."  (AR 27.)

Dr. Brophy opined that Plaintiff could sit, stand, or walk one to two hours per episode followed by 30 minutes of rest, and that Plaintiff had mild restrictions involving unprotected heights, moving machinery, and exposure to marked changes in temperature and humidity.  (AR 27, 725, 727.)  The ALJ noted that Dr. Brophy is not an acceptable medical source, but gave his opinion "some weight," finding that it was "relatively consistent with the totality of medical evidence."  (AR 27.)

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, 2010 WL 3814179, at *3 (N.D. Cal. Sep. 27, 2010).  However, where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision.  *Magallanes*, 881 F.2d at 750.  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.  *Id.*  Thus, because the

---

[3] Chiropractors are considered medical professionals, but they are not "acceptable medical sources" under the Social Security regulatory framework.  20 C.F.R. §§ 404.1513(d) (1), 416.913(d)(1).  Thus, the evaluations of a claimant by a chiropractor is considered evidence from "other sources."  *Id.*  The distinction between "other sources" and an "acceptable medical source" is important because only an "acceptable medical source" may be considered a "treating source." See 20 C.F.R. §§ 404.1502, 416.902.  In addition to "acceptable medical sources," an ALJ may nevertheless examine "other sources to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work."  20 C.F.R. § 404.1513(d).

United States District Court
Northern District of California

1    ALJ properly considered each medical opinion and found that they were not supported by the

2    record as a whole, the Court must uphold the ALJ's decision.  Further, even if the Court were to

3    find that Drs. Conrad and Brophy supported Dr. Jaffin's opinion, the harmless error rule applies

4    because, as discussed above, Plaintiff's records from his treating physician fail to support such a

5    finding.  *Curry*, 925 F.2d at 1131.

6         Based on this analysis, the Court finds that the ALJ properly gave Dr. Jaffin's opinion little

7    weight based on the fact that his opinion is inconsistent with his own findings.

8                         b.    *Plaintiff's Daily Activities*

9         The second reason the ALJ gave Dr. Jaffin's opinion little weight was that she found it to

10   be contradicted by Plaintiff's activities of daily living.  (AR 27.)  Specifically, the ALJ found that

11   Dr. Jaffin's  restrictions appeared to be inconsistent with the level of activity that Plaintiff engaged

12   in by driving several times a day.  (AR 27.)  Plaintiff also reported that he is independent in

13   "dressing, feeding, and hygiene, and able to take out the garbage, do laundry, and drive and put

14   gasoline in his car."  (AR 28, citing Ex. 5F at 2.)  In addition to driving his children to and from

15   school and activities every day, Plaintiff regularly attended church twice a week, served as an

16   assistant pastor, could go to the store with his wife, perform volunteer work, and play video

17   games. (AR 28.)  Plaintiff's reported activities contradicted Dr. Jaffin's undated, unsigned opinion

18   that Plaintiff had severe functional limitations. (AR 729.)  An ALJ's finding that the doctor's

19   "restrictions appear to be inconsistent with the level of activity that [plaintiff] engaged in'"

20   provides a specific and legitimate reason for discounting that opinion.  *Rollins*, 261 F.3d at 856;

21   *Montalvo v. Astrue*, 237 F. App'x 259, 261-62 (9th Cir. 2007) (ALJ properly discredited treating

22   physicians' conclusions regarding severity of conditions based in part on claimant's daily living

23   activities of bathing and dressing herself, seeing her children off to school, helping with household

24   chores, meeting with family, and going to the mall).

25        The Court finds the ALJ properly rejected Dr. Jaffin's opinion regarding Plaintiff's work-

26   related functional limitations to the extent it was inconsistent with Plaintiff's daily activities.

27        2.    Dr. Jaituni

28        In his Motion, Plaintiff argues that: "The opinion of Dr. Jaituni is not reflective of the

United States District Court
Northern District of California

opinion of any treating or examining physician and is not supported by substantial evidence." Pl.'s Mot. at 8.  Plaintiff fails to cite any portion of the record in support of this argument, and he also fails to provide any legal authority.  Regardless, the Court finds this argument without merit. Dr. Jaituni opined that Plaintiff could: occasionally lift or carry 20 pounds, frequently lift 10 pounds; stand or walk for at least six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and that his push or pull exertional limitations were limited in his lower extremities.  (AR 550.)  He also opined that Plaintiff had no visual, perceptive, manipulative, auditory, or environmental limitations.  (AR 551-52.)  The Court finds that this opinion is supported by Dr. Jaffin's treatment records, as discussed above, and is therefore supported by substantial evidence.  Accordingly, this argument fails.

**B.      Credibility Finding**

Plaintiff next argues that the ALJ improperly made an adverse credibility determination regarding the "intensity, persistence and limiting effects" of his symptoms.  Pl.'s Mot. at 8.  A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.* (quoting *Smolen*, 80 F.3d at 1281).  "The ALJ must state specifically which testimony is not credible and what facts in the record lead to that conclusion."  *Smolen*, 80 F.3d at 1284.  Where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by

United States District Court
Northern District of California

1    substantial evidence in the record," courts must not engage in second-guessing.  *Fair v. Bowen*,

2    885 F.2d 597, 604 (9th Cir. 1989).  However, a finding that the claimant lacks credibility cannot

3    be premised wholly on a lack of medical support for the severity of his pain.  *Light v. Soc. Sec.*

4    *Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834; *Cotton v. Bowen*, 799

5    F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is, by definition, pain that is unsupported by

6    objective medical findings.").

7         Factors that an ALJ may consider in weighing a claimant's credibility include:

8    "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

9    between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and

10   testimony from physicians and third parties concerning the nature, severity, and effect of the

11   symptoms of which claimant complains."  *Thomas*, 278 F.3d at 958-59.  Here, the ALJ properly

12   considered these factors in making an adverse credibility finding:

> After careful consideration of the evidence, the undersigned finds
> that the claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms; however, the
> claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent they
> are inconsistent with the above residual capacity assessment.
> (Exhibits 2F and 24F).   The claimant also reported that he is
> independent in dressing, feeding, and hygiene, and able to take out
> the garbage, do laundry, and drive and put gasoline into his car
> (Exhibit 5F, p.2).  At the hearing, he admitted that he drove several
> times per day, transporting his children to and from school and track
> practice.  He testified that he goes to the store with his wife, is active
> in his church, performs volunteer work, and plays video games.
>
> While the claimant has an excellent work history and earnings
> record, the medical records do not show that he is incapable of light
> exertional activity.

22   (AR 27-28.)

23        While the failure of the medical record to fully corroborate a claimant's subjective

24   symptom testimony is not, by itself, a legally sufficient basis for rejecting such testimony, it is a

25   factor that the ALJ may take into account when making a credibility determination.  *Rollins*, 261

26   F.3d at 856.  Thus, the Court finds that the ALJ did not err when she considered the lack of

27   objective evidence and objective functional restrictions as a factor in assessing Plaintiff's

28   credibility.

United States District Court
Northern District of California

The ALJ noted that the longitudinal record showed "significant improvement following the claimant's left knee replacement." (AR 28.) The ALJ also noted that Dr. Jaffin's post surgery progress notes of March 23, 2010 reported that Plaintiff "walk[ed] well with no assistive devices only a month after surgery." (AR 28, 364.) Citing Dr. Jaffin's progress notes of May 2010, the ALJ further noted that Plaintiff could "jump up and down and squat and recover." (AR 28.) The ALJ found this to be consistent with Dr. Jaffin's most recent notes from December 2011, which "confirm flexion to 115 degrees, full extension, and no abnormalities on walking, as well as the ability to toe and heel walk and jump up and down." (AR 28.)

Additionally, the ALJ noted that there were only mild degenerative changes to Plaintiff's bilateral hip joints and right knee, with no acute process. (AR 27: "Right knee x-rays from December 2010 demonstrated mild to moderate osteoarthritis and chondrocalcinosis of the medial and lateral menisci.") The x-rays of the left knee showed "no acute process" and imaging of the hips showed "slight narrowing of both hip joints and some sclerosis of the superior acetabular surfaces and slight marginal osteophyte formation bilaterally." (AR 27.) Upon examination, Dr. Pon found that Plaintiff had "some right hip and low back discomfort"" and slightly less than normal gait velocity and stride length," but maintained a stable gait with no limp. (AR 25-26.)

Drs. Jaffin, Pon, and Conrad all recommended varying limitations on postural activities such as bending, stooping, crouching or climbing. However, no physician placed any restriction on Plaintiff's ability to sit, stand, or walk that would preclude him from sitting for six-hours in an eight hour work day, or from standing or walking for 4-6 hours in an eight-hour work day. (AR 23.) Despite Plaintiff's subjective complaints, he testified that he was able to reduce his pain to a manageable level (3 to 4 on a scale of 1 to 10) by taking medication twice daily. (AR 25.) Accordingly, the Court finds that the ALJ properly considered the lack of evidence supporting Plaintiff's subjective complaints and alleged limitations as a factor in assessing his credibility.

The ALJ may also discredit a claimant's testimony when there are conflicts between claimant's testimony and his own conduct, or on internal contradictions in that testimony. *Light*, 119 F.3d at 793 (ALJ may also make an adverse credibility finding if there are inconsistencies between the claimant's testimony about his daily activities and his testimony about the nature,

23

1   effect, or severity of his symptoms.)  Such is the case here.  Plaintiff testified that he could not

2   perform any work due to severe left knee degenerative joint disease post total knee replacement

3   surgery, degenerative joint disease of the right knee, and chronic back and hip pain. (AR 47.)  Yet,

4   Plaintiff testified to a number of daily activities in conflict with his claim of inability to perform

5   sustained light exertional activity.  In making an adverse credibility finding, the ALJ determined

6   that Plaintiff's daily activities contradicted at least part of this testimony regarding his functional

7   limitations in that Plaintiff is able to routinely drive his children to and from school five days a

8   week (at least 20-40 minutes of driving per day[4]), in addition to routinely driving his children to

9   and from their after school activities three days a week, attending church services twice weekly,

10  doing laundry for two hours at a time every week, ironing, taking out the garbage, putting gasoline

11  in the car, and helping to do the bi-weekly grocery shopping for his four children.  (AR 28.)

12  Plaintiff can also independently attend to his own hygiene and feeding.  (AR 28.)  Moreover,

13  Plaintiff is able to reduce his pain by taking his prescribed medication twice daily.  (AR 25[5].)  As

14  such, the ALJ properly considered Plaintiff's daily activities as a factor in assessing his credibility

15  regarding his functional limitations due to pain from his back, hips and knees.

16          The Court finds that based on this record, the ALJ provided clear and convincing reasons

17  for finding Plaintiff's testimony to be not credible with respect to the effect of his pain on his

18  functional limitations.  Accordingly, no reversible error was committed.

19  **C.      Listing 1.02**

20          Finally, Plaintiff argues that his degree of impairment meets or equals Listing of

21  Impairments 1.02.

22          Listing 1.02 requires the following:

23          1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross
            anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,

24

---

25  [4] Plaintiff testified the school was five to ten minutes away.  (AR 43)  A minimum of four trips

26  daily, at five minutes per trip, would be twenty minutes of routine driving per day.  Four trips at
    ten minutes per trip would equal forty minutes of routine driving per day, in addition to Plaintiff's

27  other regular driving activity.

28  [5] Plaintiff rated his pain as a 3 to 4 out of 10 after taking medication, with 10 being commensurate
    with the need for immediate medical intervention.

United States District Court
Northern District of California

instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20. C.F.R. § 404, Subpart P, Appendix 1 § 1.02.

At step three of the evaluation process, the ALJ must determine whether a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the Listing of Impairments.  20 C.F.R. § 404.1520(d).  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).  In order for a claimant's impairment or combination of impairments to meet the requirement of a listing, all of the criteria of that listing and the duration requirement must be satisfied.  20 C.F.R. § 404.1525(c)(3).

A claimant bears the burden of proving that he or she has an impairment that meets or equals the criteria of a listed impairment.  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (the burden of proof rests with the claimant to provide and identify medical signs and laboratory findings that support all criteria for a Step 3 impairment determination).

Plaintiff fails to meet the burden of proof establishing that his impairments meet or equal Listing 1.02.

By definition, the inability to ambulate effectively means:

> . . . an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. § 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(1).

"To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." *Id.*, § 1.00(B)(2)(b)(2).  Examples of ineffective ambulation include, "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.*

First, Plaintiff does not require the use of any assistive device to walk, but uses a cane to walk long distances, or for support when tired.  (AR 49.)  Plaintiff's treating physician noted that Plaintiff "walked well" without the use of an assistive device, could heel and toe walk, jump up and down, and squat and recover.  Plaintiff testified that he has the ability to walk without assistance from a companion, and that he walks independently for approximately 20 minutes, two to three times a week, with the help of his cane.  (AR 51.)  Plaintiff can walk one block before needing a rest.  (AR 244.)

No doctor opined that Plaintiff is wholly unable to walk on uneven ground.  Instead, Plaintiff points to Dr. Conrad's report, in which he opines that Plaintiff would have a functional limitation of not ambulating on uneven surfaces.  (AR 504.)  The only medical evidence of record cited by Plaintiff supporting this claim is the August 24, 2010 report of agreed medical examiner, Dr. Conrad.  (AR 504.)  Dr. Conrad opines that Plaintiff be subject to certain work restrictions, such as being "precluded from crouching, crawling, pivoting, kneeling, squatting, walking on uneven terrain, climbing, and activities of comparable effort" with respect to his left knee and right ankle injuries.  (AR 504.)  This is not the same thing as finding Plaintiff could not walk on uneven terrain at a reasonable pace for one block.  Plaintiff has never testified that he could not walk on uneven terrain.  Moreover, Plaintiff reported that he could climb stairs after his knee replacement, but needed to hold on to the rail when he went down.  (AR 212.)

Second, the record establishes that Plaintiff is capable of effectively initiating, sustaining, and completing activities of daily living which require ambulation, such as being able to shower,

do laundry, iron, cook breakfast, go grocery shopping, take out the garbage, go to doctor's appointments, attend school sporting events, attend church, perform volunteer work, drive his children to school, church, and activities, attend bible study, and serve as an assistant pastor during church services.  (AR 42, 46, 49, 50-51, 52.)  The record also demonstrates that Plaintiff can carry out routine ambulatory activities without "an extreme limitation of the ability to walk."  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(2).  These activities demonstrate that Plaintiff's impairments do not meet or equal Listing 1.02.

Based on this analysis, the Court finds that the ALJ did not err in concluding that Plaintiff does not meet or equal Listing 1.02 because the ALJ considered all of the medical evidence of record in assessing Plaintiff's functional abilities with respect to his injuries, and the medical evidence of record failed to support an extreme limitation of Plaintiff's ability to walk.

## CONCLUSION

Based on the analysis above, the Court hereby DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: January 29, 2014

_____
MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
Northern District of California